## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**N2N COMMERCE, INC.,**               Chapter 7
    Debtor                         Case No. 09-10246-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

### I. INTRODUCTION

The matter before the Court is the Motion to Dismiss, Abstain, or, in the Alternative, for Relief from Stay (the "Motion") filed by Lawrence Bohn ("Bohn"), Joel Cutler ("Cutler"), Sharen Turney ("Turney"), Martyn Redgrave ("Redgrave"), Ruben Pinchanski ("Pinchanski"), Stephen Asbaty ("Asbaty"), Wendy LaHaye ("LaHaye"), and Mark Delcher ("Delcher")(collectively, "Movants").[1]  Among the arguments they make in their Motion, Movants contend that the bankruptcy case commenced "by and through Joseph F. Finn, Jr., in his capacity as Assignee for the Benefit of Creditors of N2N Commerce, Inc." should be dismissed because Joseph F. Finn, Jr., the Assignee for the Benefit of the Creditors of N2N (the "Assignee"), was not authorized to file a bankruptcy petition on behalf of N2N Commerce, Inc. ("N2N").

Finn, on behalf of the Chapter 7 Debtor, creditors, NaviSite, Inc. and Optaros, Inc.

---

[1] Movants are former officers and directors of N2N Commerce, Inc.

1

(collectively, the "Creditors"), and the Chapter 7 Trustee filed oppositions to the Motion in which they contend that the bankruptcy case is needed to protect, preserve and maximize the assets of N2N. The Assignee represented that he filed the bankruptcy petition after consultation with the largest creditors of N2N, while the Creditors contend that the Motion is "a thinly veiled attempt by the Former Officers and Directors to avoid liability for their improper conduct as directors and officers of the Debtor." Finally, the parties opposing the Motion assert that Movants lack standing to contest the petition.

The Court heard the Motion and Oppositions on February 26, 2009.[2] Upon consideration of the Motion, Oppositions, memoranda, and exhibits attached to the pleadings, as well as the existing record, the Court shall treat the Motion as a motion for summary judgment. *See* Fed. R. Bankr. P. 7056. The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

**II. FACTS**

   A. Background

N2N, "by and through Joseph F. Finn, Jr., in his capacity as Assignee for the Benefit of Creditors of N2N Commerce, Inc." filed a voluntary petition under Chapter 7 of the Bankruptcy Code on January 14, 2009. On January 30, 2009, the Assignee filed schedules of assets and liabilities, and a Statement of Financial Affairs on behalf of N2N. On Schedule

---

[2] Following the hearing, the Court directed Movants to serve Motion on all creditors together with notice of a March 6, 2009 deadline for filing objections to the Motion. Movants complied with the Court's order. No additional objections to the Motion were filed.

B- Personal Property, Finn disclosed cash in the sum of $208,061.46 in his operating account and causes of action against certain former officers, directors and stockholders, as well as causes of action for fraudulent conveyances against former insiders, all with unknown values. The Assignee disclosed no other assets.

On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Assignee listed approximately 80 creditors with claims totaling $13,388,573.52. He disclosed no other creditors.

On February 4, 2009, Movants filed the Motion that is now before the Court, together with a Memorandum to which they attached 1) the Assignment for the Benefit of Creditors, dated January 4, 2008, pursuant to which Finn agreed to accept an assignment of the assets of N2N; 2) the By-Laws of N2N, which was initially known as Everest Commerce, Inc.; and 3) a Verified Complaint for Declaratory Judgment filed by Pinchanski, Turney, Redgrave, Cutler, Bohn, Asbaty and LaHaye against the Assignee and N2N, as a nominal defendant, in the Delaware Chancery Court.

The following facts can be gleaned from the Motion and Oppositions. N2N was a start-up company incorporated in Delaware. It was founded in June of 2006 and conducted business from premises located in Cambridge, Massachusetts. Its purpose was to develop and market a software platform to facilitate internet-based retail sales. Its initial investors were General Catalyst Group IV, L.P. and General Catalyst Entrepreneurs Fund IV, L.P. (collectively, "General Catalyst") and L.B.I. Holdings, Inc. ("LBI"), a subsidiary of Limited

Brands, Inc.[3] Turney and Redgrave were LBI's designees on the Board of Directors of N2N, while Bohn and Cutler were General Catalyst's designees. Pinchanski was the fifth director and, according to the Assignee, was a co-founder and Chief Executive Officer of N2N. Asbaty and LaHaye were officers of N2N and Delcher was an employee.[4]

N2N worked to develop the software platform until December of 2007 when its financing was depleted, and it was forced to close its doors. Movants contend that N2N's Board considered all options available to the company for winding up its affairs and liquidating and distributing its assets, including the possibility of filing a voluntary Chapter 7 petition. Again, according to Movants, on January 3, 2008, N2N's Board of Directors unanimously voted to enter into an Assignment for the Benefit of Creditors. The next day, N2N entered into an Assignment with Finn. Movants represent, and Schedule B reflects, that the Assignee has liquidated all of N2N's assets, except certain intangible assets with unknown values.

In their Oppositions, the Creditors and the Assignee represented that N2N purchased one or more directors and officers liability insurance policies from Federal Insurance Company at the time of the Assignment. Further, they represented that General

---

[3] LBI is the parent of Victoria's Secret Direct, LLC.

[4] In the Statement of Financial Affairs filed by Finn on behalf of N2N, Finn represented that LBI holds 35% of the convertible preferred stock and 50% of the voting common stock of N2N; General Catalyst holds 65% of the convertible preferred stock and 50% of the voting common stock; Pinchanski holds 71.42% of the non-voting common stock, while Asbaty and LaHaye each owned 14.29% of the non-voting common stock.

4

Catalyst, LBI and the insurance carrier negotiated a multi-million dollar settlement that included payments from the carrier on account of the insurance policies that were property of N2N without notifying the Assignee. According to the Assignee, he did not discover the settlement until the fall of 2008.

On December 17, 2008, following the liquidation of the assets of N2N, Finn commenced an action in Massachusetts Superior Court Department of the Trial Court against Pinchanski, Asbaty, LaHaye, and Delcher. Pursuant to his four-count complaint, Finn sought the avoidance of allegedly fraudulent transfers under the Massachusetts version of the Fraudulent Transfer Act, *see* Mass. Gen. Laws ch. 109A, §§ 5 and 6, with respect to bonuses, severance payments, and other expenditures made to, or authorized by them, in August of 2007 and December 2007 while N2N was undercapitalized and insolvent. *See* Finn v. Asbaty, Civ. Action No. 08-5575-BLS.

On January 5, 2009, approximately one week before the commencement of the bankruptcy case, Movants commenced a three-count declaratory judgment action in the Court of Chancery for the State of Delaware, *see* Pinchanski v. Finn, Civil Action No. 4266-CC, seeking declarations that, as officers and directors of N2N, they did not breach their fiduciary duties under Delaware law, that they did not commit waste of corporate assets, and that they are not liable for any fraud.

   B. The Assignment for the Benefit of Creditors

The Assignment for the Benefit of Creditors, which was executed by Finn and the Chief Executive Officer of N2N, identified N2N as the "Debtor," duly organized and

existing under the laws of Delaware. It contained four recitals and six separately numbered sections, most with multiple subsections. The Debtor acknowledged that it had been forced by its financial circumstances to wind up its business and to liquidate and distribute its assets, that it was unable to pay its creditors as its obligations became due, that it wished to provide a mechanism for the payment of creditors, and that it "determined that the most efficient and economical mechanism to accomplish this purpose is to make an assignment for the benefit of creditors." The Assignee acknowledged that he agreed to accept the assignment "under the terms and conditions hereof."

The first section of the Agreement contained a number of definitions. Notably, priority Creditors were defined with reference to 31 U.S.C. § 3713 and "Section 507(a) of the United States Bankruptcy Code in effect on the date hereof, as modified in section 5.10 below."

Section 2 contained language whereby the Debtor conveyed and assigned to the Assignee all of its real and personal property, wherever located and without limitation, including the following: inventory, accounts receivable, equipment, notes, bills, drafts and similar instruments, cash and deposit accounts, securities, real property and leasehold interests, contracts and insurance policies, intellectual property, all products and proceeds of its assets, books and records, and "any and all other legal or equitable interests in property of any kind." The Debtor also assigned to the Assignee "claims of every nature, contingent or non-contingent, including without limitation those arising from tort, contract, breach of duty, rights to tax refunds and rights to seek damages, specific performance or

6

to exercise set-off, subject to applicable contracts."

Section 3 provided that the assets would be subject to valid security interests, mortgages or liens and would be enforceable against the Assignee.

Section 4 of the Assignment specified the powers and duties of the Assignee. The parties set forth nineteen powers and duties, including the duty to hold the assets in trust for the benefit of the assenting priority and secured creditors; to incur and pay the actual and necessary costs of managing, operating, preserving, liquidating and distributing the Assets, including paying reasonable wages, salaries, commissions, professional fees, rents, insurance premiums, maintenance charges, supplies, utilities, taxes and reasonable compensation for his services as Assignee "but in no event to exceed the greater of (a) $400 per hour or (b) maximum amount of compensation which would be permitted to a trustee in bankruptcy administering the same assets as the Assignee pursuant to 11 U.S.C. A. § 326(a)."

Pursuant to section 4.4, the Assignee had to the power "[t]o institute or defend suits, legal or equitable proceedings incident to collection, liquidation and distribution of assets." Additionally, pursuant to section 4.11, the Assignee had the ability to resign at any time and he could be removed. In either case, "a successor Assignee may be appointed by the Debtor with the concurrence of a majority in amount of the Assenting Creditors." The parties further agreed in section 4.14 that "[a]ny act or thing done by the Assignee, or by the duly authorized agents or representatives of the Assignee, shall, as to all persons dealing with such Assignee or such duly authorized agents and representatives of the

7

Assignee, be deemed to be within the purposes of this A/F/B/C and within the powers of the Assignee."

Section 5 of the Assignment pertained to rights and duties of creditors. Notably, various subsections contained references to the Bankruptcy Code. Pursuant to section 5.5, "[t]he Assignee may reduce any claim by the amount of any set-off to which the Debtor is entitled and by the amount of any payments received by the claimant from the Assignor that would have been preferences or fraudulent transfers under §§ 544, 547 and 548 of the Bankruptcy Code if the Assignor had filed a petition under the United States Bankruptcy Code on the date of the Agreement." Pursuant to section 5.7, if assenting creditors agreed to mediation in the event of a dispute with the Assignee, an attorney would be appointed "who would qualify as a disinterested person in respect of the Debtor, the Assignee and the assenting Creditor under the definition of 'disinterested person' contained in the United States Bankruptcy Code in effect on the date hereof." Pursuant to section 5. 8, the Assignee also agreed to reduce the amount of any claim by any interest that accrued after or was unmatured on the date of the Assignment by any costs of collection, late fees or similar fees or charges, and to allow "[c]laims . . . in accordance with the principles applicable to claim under Chapter 7 of the United States Bankruptcy Code."

Section 6 of the Assignment contained miscellaneous provisions, including the parties' agreement that it be construed as a Massachusetts contract, that it take effect as a sealed instrument, that it set forth "the *entire agreement* among the parties," and that it was "binding upon and inured to the benefit of the parties hereto and their respective

8

successors and assigns and may be canceled, modified or amended only by a written instrument executed by each of the parties hereto." Finally, pursuant to section 6.4, the Debtor constituted "the Assignee and his successors, the attorney and attorneys in fact of said Debtor, "irrevocably and coupled with an interest, with power of substitution in the name of the Debtor to take any act necessary or proper to the exercise of his duties hereunder."

    C. The By-Laws

Consistent with Delaware corporate law, *see* Del. Code Ann. Tit. 8, § 141, the by-laws of N2N provided that "[t]he business of the Corporation shall be managed by or under the direction of a Board of Directors who may exercise all the powers of the Corporation except as otherwise provided by law, by the Certificate of Incorporation or by these By-laws."

## III. DISCUSSION

    A. Standing

> The issue of standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To have standing to bring an appeal from a final bankruptcy court order, an appellant must be a "person aggrieved." Spenlinhauer v. O'Donnell, 261 F.3d 113, 117 (1st Cir.2001). As such, standing exists only where the order "directly and adversely affects an appellant's pecuniary interests." Id., at 117-18 (citation omitted). A party's pecuniary interests are affected if the order diminishes the appealing party's property, increases its burdens, or detrimentally affects its rights. Kehoe v. Schindler (In re Kehoe), 221 B.R. 285, 287 (1st Cir. BAP 1998).

In re High Voltage Eng'g Corp., 397 B.R. 579, 597 (Bankr. D. Mass. 2008), *aff'd*, __ B.R. __, 2009 WL 987502 (D. Mass. April 14, 2009)(citing In re Murphy, 288 B.R. 1, 4 (D. Me. 2002)).

9

Under this broad definition of standing, this Court finds that Movants' rights will be affected if the bankruptcy case remains in this Court and the Assignee proceeds with litigation against them. Accordingly, they have standing as persons aggrieved to seek dismissal.

B. Standard for Summary Judgment

In Tribeca Lending Corp. v. Laudani (In re Laudani), 401 B.R. 9, 23-24 (Bankr. D. Mass. 2009), this Court set forth the standard for summary judgment. Quoting Desmond v. Varrasso (In re Varrasso), 37 F.3d 760 (1st Cir.1994), this Court stated:

> It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). As to issues on which the movant, at trial, would be obliged to carry the burden of proof, he initially must proffer materials of evidentiary or quasi-evidentiary quality-say, affidavits or depositions-that support his position. *See* Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1517 (1st Cir.1991); Bias v. Advantage Int'l, Inc., 905 F.2d 1558, 1560-61 (D.C.Cir.), *cert. denied*, 498 U.S. 958, 111 S.Ct. 387, 112 L.Ed.2d 397 (1990); *cf.* Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7 (1st Cir.1990) ("The mere fact that plaintiff failed to file a timely opposition does not mean that defendant's Rule 56 motion should be granted"). When the summary judgment record is complete, all reasonable inferences from the facts must be drawn in the manner most favorable to the nonmovant. *See, e.g.,* Morris v. Government Dev. Bank, 27 F.3d 746, 748 (1st Cir.1994); Garside, 895 F.2d at 48; Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 934 (1st Cir.1987). This means, of course, that summary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record. *See* Blanchard v. Peerless Ins. Co., 958 F.2d 483, 488 (1st Cir.1992) (warning that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence").

Laudani, 401 B.R. at 23-24. The paramount and determinative issue raised by the Motion

and the Oppositions is whether the Assignee had authority to file a Chapter 7 bankruptcy petition on behalf of N2N. The Assignee's authority is contained within the four corners of the Assignment. Accordingly, interpretation of the Assignment will resolve the issue of whether the Assignee had authority to file a bankruptcy petition. *See* Lexington Insurance Co. v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995)(interpretation of a contract is a question of law for the court). Moreover, while the parties disagree as to the proper interpretation of the Assignment, they do not dispute the sequence of events leading up to its execution and the filing of the bankruptcy petition. Thus, the Court finds that the material facts surrounding the execution of the Assignment are not in dispute.

    C. Analysis

          1. Contract Interpretation

Under Massachusetts law, "[i]f the words of a contract are plain and free from ambiguity, then they must be construed in accordance with their ordinary and usual sense." Colorio v. Marx, 72 Mass. App. Ct. 382, 388 (2008) (citing Fried v. Fried, 5 Mass.App.Ct. 660, 663 (1977)). "The mere fact that the parties disagree with respect to the interpretation of the agreement does not make the agreement ambiguous." Colorio, 72 Mass. App. Ct. at 388 (citing Jefferson Ins. Co. v. Holyoke, 23 Mass.App.Ct. 472, 475 (1987)). In Trustees of Thayer Academy v. Corporation of Royal Exchange, 281 Mass. 150 (1932), the Supreme Judicial Court stated: "The words in question are to be construed according to the manifested intention of the parties as of the time of the making of the contract; . . . they are to be interpreted 'in accordance with the natural meaning of the words used in the

11

light of the circumstances existing at the time.'" Id. at 155 (citations omitted).

If a contract "'is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading up to its execution may be shown for the purpose of elucidating but not of contradicting or changing its terms.'" Hubert v. Melrose-Wakefield Hosp. Ass'n, 40 Mass App. Ct. 172, 177 (1996) (citing, *inter alia,* Robert Indus., Inc. v. Spence, 362 Mass. 751, 753-754 (1973)).  Thus, contracts should be construed "'with reference to the situation of the parties when they made it and the objects sought to be accomplished,'" *see* Hubert, 40 Mass. App. Ct. at 177 (citing Shea v. Bay State Gas. Co., 383 Mass. 218, 222-223, 418 N.E.2d 597 (1981) (citations omitted)), and "[t]he rule of construction that contract ambiguities must be resolved against the drafter "'must give way to the primary and inflexible rule that . . . contracts, are to be construed so as to ascertain . . . the true intention of the parties.'" Id. (citing Shea, 338 Mass. at 225).

    2. The Situation of the Parties

The Movants and the Assignee, as well as the Creditors and the Trustee, do not dispute that N2N was insolvent and incapable of continuing its operations at the time it executed the Assignment for the Benefit of Creditors.  Moreover, the parties opposing the Motion did not controvert Movants' representations in their Motion that the Board of Directors of N2N contemplated filing a Chapter 7 bankruptcy petition but unanimously voted to proceed with an Assignment for the Benefit of Creditors. *See generally* MM Cos., Inc. v. Liquid Audio, Inc., 813 A.2d 1118, 1126-27 (Del. Super. 2003) ("The most fundamental principles of corporate governance are a function of the allocation of power

within a corporation between its stockholders and its board of directors. The stockholders' power is the right to vote on specific matters, in particular, in an election of directors. The power of managing the corporate enterprise is vested in the shareholders' duly elected board representatives. . . ."). Thus, at the time N2N and Finn executed the Assignment for the benefit of creditors, N2N had considered two options, the filing of a Chapter 7 bankruptcy petition, and, alternatively, an assignment for the benefit of creditors, and its Board chose the latter option.

In In re Arkco Properties, Inc., 207 B.R. 624 (Bankr. E.D. Ark. 1997), the bankruptcy court was required to consider who had the authority to authorize a corporate bankruptcy case. Under Arkansas law, like Delaware law, corporations are managed by or under the direction of their board of directors. *See* Del. Code Ann. Tit. 8, § 141 ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."). According to the bankruptcy court, "[s]tatutes with similar language have been held to authorize the board of directors to file a petition in bankruptcy." Id. (citing Boyce v. Chemical Plastics, Inc., 175 F.2d 839, 843 (8th Cir.1949), *cert. denied*, 338 U.S. 828, 70 S.Ct. 77, 94 L.Ed. 503 (1949)). The bankruptcy court added:

> It is well-settled that a bankruptcy filing is "a specific act requiring specific authorization." In re Stavola/Manson Electric Co., 94 B.R. 21, 24 (Bankr.D.Conn.1988); In re Moni-Stat, Inc., 84 B.R. 756, 757 (Bankr.D.Kan.1988); In re Beck Rumbaugh Assoc., Inc., 49 B.R. 920, 921 (Bankr.E.D.Pa.1985), *appeal dismissed*, 1985 WL 38 (E.D.Pa. Sept. 11, 1985); In re Penny Saver, Inc., 15 B.R. 252, 253 (Bankr.E.D.Pa.1981); In re Al-Wyn Food Distributors, Inc., 8 B.R. 42, 43 (Bankr.M.D.Fla.1980). In virtually every instance, this authority has been held to rest solely with the board of

13

>
> directors. *See, e.g.*, In re Runaway II, Inc., 159 B.R. 537, 538 (Bankr.W.D.Mo.1993) ("[H]istorically it has always been true, even before the Bankruptcy Reform Act of 1978, that a valid resolution of the Board of Directors of a corporation was a prerequisite to the filing of a voluntary petition in bankruptcy by a corporation."); In re Giggles Restaurant, Inc., 103 B.R. 549 (Bankr.D.N.J.1989) ("[I]t is clear that any corporate resolution which authorizes the filing of a voluntary bankruptcy petition must originate at a validly held meeting of directors and must be approved by the proper number of such directors."); In re Moni-Stat, Inc., 84 B.R. 756, 757 (Bankr.D.Kan.1988); ("[T]he law is clear that the decision of whether or not a corporation should file bankruptcy is a business decision to be made only by the board of directors.") (emphasis added); *see* In re M & M Commercial Services, Inc., 115 B.R. 212 (Bankr.E.D.Mo.1990). The Court finds no authority in the law or the By-laws of these corporations that would permit any governing body, other than the board of directors, to authorize the filing of a petition in bankruptcy.

207 B.R. at 628. Like the Arkansas court, this Court concludes that the decision to commence a Chapter 7 case rested with the Board of Directors of N2N under its by-laws and Delaware law. The question is whether the Board of Directors of N2N could or did intend to delegate that authority to the Assignee. Resolution of that question turns on the language utilized in the Assignment.

> 3. Interpretation of the Assignment with Reference to the Situation of the Parties

Based upon the language employed in the Assignment, the Court concludes that the Board of Directors did not authorize the Assignee to file a bankruptcy petition, a conclusion buttressed by the consideration that a Chapter 7 bankruptcy case and an assignment for the benefit of creditors are similar, but alternative, remedies. As one commentator noted,

> An assignment for the benefit of creditors is the state law counterpart to Chapter 7 liquidation in bankruptcy, without all the requisite formalities.

State law, not federal bankruptcy law, governs ABCs, and most states have codified their provisions regarding assignments. In an ABC, the debtor (assignor) voluntarily transfers all of his or her assets by formal deed to another person (assignee), who holds the property in trust for the benefit of creditors. Creditors then choose whether to participate in the ABC. Thus the assignee is the analogous equivalent to the Chapter 7 trustee. An ABC's purpose is to provide the assignor's creditors with an equal distribution of the assignor's estate in proportion to their claims. Once the trust agreement is created, the assignee stands in the debtor's shoes and can protect him or her from creditors because the assignee now possesses legal and equitable title to all assets. In other words, because the debtor no longer has title to his or her assets, the creditor cannot attach or execute on the property transferred to the assignee.

ABCs have re-emerged as viable nonbankruptcy alternatives because of the many advantages they have over more formal bankruptcy proceedings. First, ABCs allow debtors more flexibility. For instance, unlike in Chapter 7 where creditors choose a Chapter 7 trustee, the debtor chooses whom it wants to be the assignee--the party charged with the duty to liquidate the company's assets. Second, ABCs are faster than Chapter 7 liquidations. To illustrate, by allowing the debtor to choose the assignee, the ABC expedites the liquidation process because, theoretically, the assignee will be more familiar with the debtor's business, the location and value of its assets, as well as the appropriate distributions to creditors. Consequently, the assignee can increase the recovery of outstanding accounts receivable, thereby reducing the overall deficiency on debt. This increase in receivables recovery benefits guarantors of secured debt because their deficiency decreases when receivable collection increases. Third, assignments do not attract as much negative publicity as bankruptcy filings. Therefore, financially stressed debtors will not likely face as many problems with suppliers and other parties that are necessary to the operation of their business.

A final advantage of using an ABC is that they are not court-supervised unless the ABC statute requires court supervision. Thus the assignee need not petition the court for an order every time he or she wants to make a decision regarding the assignor's assets. This lack of judicial oversight may worry creditors, especially since the assignor selects and pays the assignee. Nonetheless, the assignee owes fiduciary obligations to creditors, granting them a cause of action if the assignee acts imprudently. In the end, both the debtor and creditors benefit from a more efficient wind-down and liquidation of the company's assets.

Jonathan T. Edwards, *The Crossroads: the Intersection of State Law Remedies and Bankruptcy*, 18 J. Bankr. L. & Prac. 2, Art. 4 ( April 2009) (footnotes omitted).

In view of the advantages of assignments for the benefit of creditors, the Court concludes that, for the Assignee, the Trustee, and the Creditors to succeed in their Oppositions to the Motion, the language of the Assignment must clearly manifest the intention on the part of the Board of Directors of N2N to authorize the filing of a bankruptcy petition by the Assignee. The Court can discern no such intention. On the contrary, the references in the Assignment to N2N as the "Debtor" and to various sections of the Bankruptcy Code manifest the intention of the Board for the Assignment to serve as the exclusive vehicle for winding up the affairs of N2N. Because the parties demonstrated significant awareness of the Bankruptcy Code and, indeed, adopted some of its provisions for the liquidation and distribution of N2N's assets, the Court concludes that had the Board of Directors intended for the Assignee to have the power and authority to file a bankruptcy petition it would have expressly so stated in Section 4 of the Assignment. It did not. The general language empowering the Assignee to liquidate assets and serve as attorney in fact for N2N cannot be construed to grant the Assignee the extraordinary authority to commence a bankruptcy case, authority that is almost always reserved for the Board of Directors.[5]  *See* In re Arkco Properties, Inc., 207 B.R. 628. *Cf.* Wynco Distributors, Inc. v. Wynn (In re Wynco Distributors, Inc.), 126 B.R. 131 (Bankr. D. Mass. 1991), *aff'd*, 48 F.3d

---

[5] The Court could find no case in which a court authorized an Assignee for the Benefit of Creditors to commence a bankruptcy case.

1211 (1st Cir. 1995).

Although the Assignee and the other parties opposing the Motion point to various sections of the Assignment to support their positions that the Assignee was vested with the authority to file a bankruptcy petition, the Court concludes, in view of the provisions of Delaware law cited above, N2N's by-laws, the settled law that a bankruptcy filing is "a specific act requiring specific authorization," Arkco Properties, 207 B.R. at 628, and the absence of express authority in the Assignment, that the Assignee lacked authority to commence a bankruptcy case on behalf of N2N.[6]

## IV. CONCLUSION

In view of the foregoing, the Court shall enter an order granting Movants' Motion to Dismiss. Because the Court intends to dismiss the bankruptcy case filed on behalf of N2N by the Assignee, Movants' alternative requests for relief are moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: May 1, 2009
cc:  Michael J. Pappone, Esq., John G. Loughnane, Esq., Gary W. Cruickshank, Esq., D. Ethan Jeffery, Esq., Mark T. Power, Esq., U.S. Trustee

---

[6] The Creditors, however, can file an involuntary petition under 11 U.S.C. § 303.